Filed 3/29/13  Stacy K. v. Superior Court CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STACY K., | B246299 |
| Petitioner, | (Los Angeles County Super. Ct. No. CK73668) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Sherri S. Sobel, Juvenile Court Referee.  Petition denied.

Frank E. Ostrov for Petitioner.

No appearance for Respondent.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Real Party in Interest.

————————————

Stacy K. (father) has filed a petition for extraordinary writ (Cal. Rules of Court, rule 8.452) challenging an order of the juvenile court terminating reunification services with his four children and setting a hearing pursuant to Welfare and Institutions Code section 366.26.[1] Father contends the juvenile court erred when it found that the Los Angeles County Department of Children and Family Services (DCFS) had provided him with reasonable reunification services because the court failed to provide services tailored to the family's special needs. We find substantial evidence supports the juvenile court's order. Accordingly, we deny the petition.

## FACTS AND PROCEDURAL HISTORY

Father's dependent children are a daughter, S., now age 11; two sons, J., age four and JaC., age three; and a second daughter, H., age 22 months. Although the family had a prior history with DCFS,[2] in this instance the children were detained in Riverside County because the family was living there. On June 9, 2011, there was a domestic dispute at the family home. Father was placed on an involuntary psychiatric hold (§ 5150) after he threatened to kill himself and the children. Father was admitted to the hospital on June 10, 2011, after hospital personnel concluded he could not safely be managed at a lower level of care. During his hospital stay, father was "agitated, yelling, cursing and posturing to fight with hospital personnel." Father said that he "still felt his mood changing and didn't want to get violent." He was diagnosed as bi-polar and manic. At the hospital, father was prescribed four medications, but on discharge he refused medication and further therapy.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] In *In re S.K.* (June 8, 2009, B211705) [nonpub. opn.], Division Five of this court affirmed a jurisdictional order involving S. and J. We take judicial notice of Division Five's opinion. (Evid. Code, § 452, subd. (d).)

In a section 300 petition filed June 13, 2011, and amended on July 7, 2011, the Riverside County Department of Public Social Services (DPSS) alleged that the children were at risk because the parents had unresolved mental health and controlled substance issues, engaged in ongoing acts of domestic violence, and exposed the children to an unsafe and unsanitary home environment. It was further alleged that mother had failed to reunify with other children. DPSS also alleged that two-year-old J. was physically abused and "sustained multiple looped scars on various planes of his body consistent with whippings."

The juvenile court of Riverside County sustained a second amended petition on August 17, 2011. In a report prepared for the jurisdiction hearing, DPSS noted that father had been before the juvenile court twice previously, but had failed to benefit from any of the previous services offered. The juvenile court nonetheless ordered that father receive family reunification services. Father was ordered to "enroll and actively participate in a domestic violence program which addresses anger management and the roles of victims and perpetrators in domestic violence." Father was further ordered to undergo a psychological assessment and an evaluation to determine if he required psychotropic medication. In addition, father was to participate in counseling and "an intensive, hands-on, DPSS-approved parenting education program that is age-specific to [the] children." Finally, father was to be evaluated for possible substance abuse issues with an approved substance abuse program, and was prohibited from using marijuana for medical purposes unless he could provide DPSS and the juvenile court with "proof that it is not being smoked and is medically appropriate."[3]

In accordance with the juvenile court's order, father underwent a series of psychological tests administered by Dr. Robert Suiter in early October 2011. Relating the incident that resulted in his involuntary hospital commitment, father said that he "'caught' his wife with another man and became involved in a physical fight with the man." Father was "quite dismayed at being hospitalized" because he considered himself

---

[3]     Father had been shot in the spine and uses marijuana to alleviate chronic pain.

"mad not crazy." Dr. Suiter's testing revealed that father had a propensity toward anger and mood swings. Father's profile on one test (the "Millon Clinical Multiaxial Inventory") revealed that father "likely [had] very heightened and prominent narcissistic traits. Such persons tend to feel superior to others and have a tendency to exaggerate their abilities and positive attributes." Such individuals also "have a need to be conspicuous and provoke affection and attention. In that same regard, they may have difficulty if they do not feel properly recognized or if they feel forced to accept the opinions of others or to compromise." Father "described himself as being rather impatient and easily irritated as he is likely to be relatively quick tempered at times." Father's self-assessment was consistent with his profile on the "Personality Assessment Inventory," the results of which indicated that while father "likely views himself as being active, outgoing and ambitious, others may perceive him as being impatient and somewhat demanding." Father's profile on the "State-Trait Anger Expression Inventory-II" indicated that father "has a fairly high predisposition to become angry, and he is likely to be chronically temperamentally angry in a wide range of situations particularly when he feels threatened. In the same vein, he is likely to be chronically hostile and aggressive and to have major problems sustaining relationships as other persons are likely to avoid him. In that regard, he tends to be thin-skinned, hyper-vigilant and demeaning."

Based on the results of father's psychological tests, and various DPSS reports concerning father's interaction with its social workers[4] and others, Dr. Suiter concluded that father had "an unwarranted anger problem as he is prone to instinctively and quite immediately respond with anger and threats of bringing lawsuits or requesting to change doctors or evaluators in situations where he feels challenged or threatened." Father likewise had "a number of traits and characteristics which quite significantly bring into

_____

[4]     One DPSS social worker stated that father's visits with the children at the agency's office were "full of disruptions and chaos. [Father] spends most of his visits making unreasonable demands and complaining about case management issues." During one visit, father saw that J. had a small bump on his head. The DPSS worker stated that father "became belligerent and increasingly hostile. He backed me into a wall and began to scream in my face."

4

question his ability to adequately care for his children at this juncture." Dr. Suiter recommended that father take parenting and anger management classes.

From September to November 2011, father participated in a parenting and substance abuse program called "Positive Steps" in Lakewood, near his home in Long Beach. Father was allowed to complete an "accelerated" program by meeting with a counselor in one-on-one sessions and attending Narcotics Anonymous meetings in the community. Although father completed a 16-week program in eight weeks, he did not attend any classes, and his counselor was not a licensed therapist.

On November 14, 2011, father participated in an intake session at Coast Counseling in Long Beach. According to the intake counselor, father appeared for the initial session, vented about how he had been wronged by Riverside County, and was discharged after he failed to attend two subsequent appointments.

On November 23, 2011, the juvenile court transferred the case to Los Angeles County. Father participated in a Team Decision Making (TDM) meeting on February 8, 2012, to discuss the case plan and DCFS's recommendations for an upcoming court hearing. DCFS was concerned that father had participated in a parenting program that did not actually provide him with any instruction. DCFS asked that father participate in an anger management program, as recommended by Dr. Suiter, and offered to provide father with funds for this purpose. Father became irate and said that he would not do anything beyond what the court in Riverside County had originally ordered. Following the TDM meeting, father remained in the building lobby and demanded to meet with an administrator, even after being told repeatedly that he would have to make an appointment, because no administrators were available to meet with him at that time. Eventually a security guard asked father to leave. Father said he would return in an hour (which he did not). DCFS administration and security staff decided that if father did return, Lakewood Deputy Sheriffs would be called to circle the building because father was acting in a threatening manner and the reception staff did not feel safe. Although father had a monitored visit with the children scheduled the next day, DCFS cancelled the visit due to father's behavior because the social worker felt unsafe.

The above incident aside, DCFS reported on February 21, 2012, that father had been having weekly monitored visits with the children, who were always happy to see him and felt comfortable in his presence. However, father stated that he was unwilling to participate in any further services, and blamed the mother for the family's current involvement with DCFS. DCFS recommended that the juvenile court continue reunification services, subject to Dr. Suiter's recommendation that father participate in anger management and parent education, and comply with the Riverside court's order that he undergo a psychiatric medicine evaluation. At a hearing on February 21, 2012, the juvenile court found that both DCFS and father had complied with the case plan in making reasonable efforts to enable the children's safe return home. The court continued the matter to August 21, 2012, for a 12-month review hearing.

In a report prepared for the 12-month review hearing, DCFS social worker Redina Sheriff reported that although the children remained suitably placed and physically healthy, S., and to a lesser extent J., had "ongoing behavioral issues." Specifically, S. exhibited "extreme outbursts, lying and running away." S. also had ongoing disciplinary issues in school, including "getting off task, causing class disruptions, struggling in the area of peer relationships, and disrespecting adult authority." Ms. Sheriff believed father contributed to S.'s behavioral problems because S. had been present when father had spoken negatively about DCFS and court employees, and his court-appointed attorney in particular. Many of Ms. Sheriff's contacts with father during the reporting period involved father "expressing discontent about his case or disagreement with the case plan contents." DCFS changed father's visitation day at his request to accommodate his attendance at a parenting group.

J. also exhibited behavioral difficulties such as defiant behavior, temper tantrums, difficulty following instructions, and scratching his face.

Father was "resistant to accepting the case plan" and juvenile court orders from both Riverside and Los Angeles Counties. When DCFS confirmed the orders, father argued that some items were completed, some were not ordered, and his attorney told him not to complete certain others. Father continued to insist that he had been unfairly treated

6

in both Riverside and Los Angeles Counties. DCFS also reported that father had not complied with a number of the courts' orders. For example, father enrolled in domestic violence classes, but the classes were for victims, not batterers. When informed that these classes were not compliant with the courts' orders, father became angry and blamed Ms. Sheriff for failing to tell him that he needed to be in batterers' counseling. In fact, the Riverside court's order clearly provided that father was to participate in a program for victims and perpetrators. Father also failed to comply with the court's order that he undergo a psychotropic medicine evaluation, claiming he was unable to obtain an appointment. Ms. Sheriff commented that father "does not acknowledge that he has any mental or emotional issues that warrant medication." Father did comply with the court's order that he undergo a psychiatric evaluation, which was conducted by Dr. Suiter, and partially complied with the order that he participate in anger management and parenting classes, by enrolling in "Project Fatherhood," a group under the auspices of Children's Institute, Inc. Father did not comply with the order that he undergo random drug testing.

DCFS also reported that father had disregarded the juvenile court's orders in other ways. He acted aggressively with the children's caregiver demanding that she not speak Spanish in front of the children, and that H. wear only those shoes that father provided. Father brought additional visitors to visits with the children, stating that he did not care what Ms. Sheriff had to say on the matter. Father tended to "rationalize his non-compliance [with] court orders." During another visit, S. tried to tell father that she was not doing well in her foster placement, but father said "he was only present at the visits for the fun time with his children" and he "didn't want [S.] to tell him anything that has to do with bad things." Father did tell S. that if she wanted to address him with any other matters, it would have to be after the visit.

Although DCFS recommended that father's family reunification services be terminated at the 12-month hearing that was to occur on August 21, 2012, the juvenile court continued the matter and ordered DCFS to submit a supplemental report. The court also ordered a mental health assessment for S.

7

DCFS prepared an interim review report in anticipation of the continued 12-month hearing on October 24, 2012. Several major changes had occurred. First, the younger three children's caregiver requested that the children be removed from her home. J. and JaC. had become more aggressive. JaC. was pinching and hitting the caregiver; J. told the caregiver that "You're not my daddy, and my daddy says I don't have to listen to you." JaC. was replaced alone in a foster home.

Second, S. had been prescribed the medication Abilify when she was at Del Amo Hospital. Father insisted that S. not be administered any psychotropic medication and ordered that the medication be discontinued. Without the medication, S. became "very physically aggressive toward others," and she constantly threatened to hurt others. DCFS arranged a meeting between father and S.'s doctor so the doctor could explain to father why S. needed the medication. Father said he would attend the meeting, but did not.

The juvenile court conducted a contested 12-month hearing on December 7 and 10, 2012. At the time of the hearing, the children had actually been detained from the father for 16 months. Father testified that he was doing individual counseling with Dr. Grant Seo through Project Fatherhood. Father testified that he would cooperate with doctors or other professionals who might recommend some intervention, such as medication for his children. The court noted there were concerns that when father and the children were together, the children were "kind of out of control" and father was not able to "draw them back in control." Father assured the court that he was willing to "accept the fatherhood classes continually" so he could get the children back in control. When asked on cross-examination what issues had brought his family before the juvenile court, father said he had made "some really dumb choices" and, against the advice of family members and others, had stayed in a marriage that was "just not good for me." Father believed the children were having behavioral issues because they were not used to being separated; because they had seen only him; and their mother had not visited them in almost two years. Father believed he was stable enough to have the children returned to his custody, and stated "I would do anything the judge asked me to do to have my kids."

8

S.'s caretaker Latanya G., who had been monitoring father's visitation with all the children for nearly five months, was called as a witness by father's counsel at the juvenile court's request. Ms. G. testified that the children were bonded to their father and appeared comfortable with him "sometimes." When asked by the court whether the father was able to redirect the children's behavior when needed, Ms. G. likewise responded "sometimes." When asked by father's counsel whether father was "very caring of his kids," Ms. G. again response was "[sometimes yes] and sometimes no." Responding to further questioning, Ms. G. explained that father sometimes became emotional and upset, but was "quite rational" and attentive to the children when he calmed down. However, a one-hour visit did not afford father that much time to calm down. On one occasion, father had what Ms. G. considered to be an "over the top" reaction to a scratch on JaC.'s head, repeatedly accusing Ms. G. of hurting JaC. and insisting that she report the matter to DCFS. Father also took the opportunity at his one-hour visits to discuss case issues with J. and JaC., telling them that "he's going to court and he hopes that . . . they get to come back home with him." Ms. G. monitored father's telephone calls with S. because S. had mental and emotional issues and father's behavior provoked these issues.

In closing argument, father cited a letter from father's therapist to the effect that father had made "significant progress" as a result of his individual counseling sessions, and had complied with "certain of" the Riverside juvenile court's orders. Counsel requested that the children be returned to father that day, or, if the court was not so inclined, that father be given an additional 60 days of reunification services.

The juvenile court was not inclined toward either option. First, the court pointed out that father had not had a single unmonitored visit with the children, nor had DCFS increased the length of father's visits or liberalized them to be unmonitored. Although father's therapists had said "he's doing better. He's working better," they had not recommended sending the children home. The court commented that although father had "said good things on the stand. . . . But the fact of the matter is when asked to show up at a doctor's appointment, he didn't. When asked to talk to his children about things that

9

are going on, he didn't.  Every little thing becomes a big thing.  Every big thing becomes a mountain, but only as it affects [father] and what he's looking at for his children."  The court acknowledged that the children loved father, and recommended that father "keep doing what he's supposed to be doing and keep doing it well."  However, the court found by a preponderance of the evidence that, as of the hearing date, return of the children to father's care would create a substantial risk of harm to them.  The court stated that although it could find "regular and consistent contact for the father," it could "not find that [father] made significant progress in resolving the problems which led to removal or that he demonstrated the capacity and ability to complete the objectives of the treatment plan and provide for the children's safety, protection, physical or emotional well-being and special needs."  The court terminated father's reunification services, and stated it could "not return the children . . . never having any unmonitored contact, and I do not believe that there is a substantial probability of return in 60 days."

## DISCUSSION

Father contends the juvenile court erred when it found DCFS had made reasonable efforts to reunify him with the children, because DCFS did not consider the family's special needs or tailor its services to the father's "special mental health needs."

It is evident that father perceives "the family's special needs" and his own "special mental health needs" to be one and the same.  We note first of all that there is no evidence in the record of father having raised this issue at any time during the 16-month reunification period.  Father did not request any additional services tailored to his "special mental health needs" but instead complained that DCFS was making him do more than he believed the court had ordered.  For example, Dr. Suiter recommended, and the juvenile court ordered, that father participate in parenting, anger management and domestic violence programs.  Father chose a domestic violence program tailored to victims, claiming that the children's mother, not he, was the aggressor.  When DCFS informed him he had to attend a program for batterers, he asserted that the court had not ordered him to participate in such a program.  Likewise, father enrolled in "Positive

10

Steps," a parenting program that did not comply with the case plan because it did not require him to attend any classes, and his counselor was not a licensed therapist. Father also attended an intake session at Coast Counseling, spent the entire session complaining that he had been wronged, and was discharged from the program when he failed to attend two subsequent appointments. It is clear father approached the case plan as something he could do as he saw fit, and his view did not necessarily comport with the juvenile court's orders.

Substantial evidence supports the juvenile court's finding that DCFS provided adequate reunification services. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545; *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113.)

As the juvenile court in this case recognized, the real issue it had to address at the 12-month hearing was whether the children could be returned to father at that time, and, barring that, whether they could be returned within the 60 days remaining until the end of the 18-month reunification period.

Section 366.21, subdivision (f), provides that a permanency planning hearing shall be held no later than 12 months after a child enters foster care. The section further provides that "[T]he court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

The juvenile court in this case found that the children would be at risk if returned to father at the 12-month hearing. Father does not, and could not, dispute that finding. Even if father had complied with all other aspects of the case plan, he had never had even one unmonitored visit, let alone an overnight visit with the children. Although father visited with the children consistently, he spent a great deal of his limited visitation time complaining about the way the children's foster parents were caring for his children. In fact, father spent so much time complaining that he had little time to develop the interactive parenting skills necessary for him to reunify with his children. Although

11

father testified at the hearing below that he would do whatever was required to have his children returned to him, he had failed to do so during the 16 months that DCFS provided him with reunification services. The juvenile court properly terminated those services at the 12-month hearing.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is made final forthwith as to this court.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P.J.
BOREN

_____, J.
CHAVEZ

12